

FILED
2022 Sep-07  PM 04:09
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| CORY FRANKS, | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 7:20-cv-00077-LSC |
| CITY OF JASPER et al., | ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM OF OPINION**

Cory Franks, a former Jasper police officer, brings this action against the City of Jasper, Jasper Police Chief J.C. Poe, Assistant Chief Paul Tucker, and Mayor David O'Mary. Invoking the protections of 42 U.S.C. § 1981, Franks seeks to recover for racial discrimination, retaliation, hostile work environment, and constructive discharge. He also brings a state law claim for assault and battery against O'Mary. For the following reasons, Franks cannot prevail on his federal claims. Accordingly, Defendants' Motion for Summary Judgment is due to be granted as to these claims. The Court declines supplemental jurisdiction over the remaining state law claim and remands this claim to the state court from which it was removed.

I.      Background[1]

In 2012, the city hired Franks as a police officer and promoted him to detective several years later. (Doc. 39-2 at 12.) In early 2017, Poe and Tucker became apprised of disconcerting allegations concerning Franks' behavior at a Jasper Holiday Inn Express—namely that Franks improperly used his position as an officer to obtain a free hotel room. (Doc. 39-7 at 89.) In response to the city's concerns, Franks provided a written statement in which he denied obtaining a free room under color of authority. (Doc. 39-2 at 39.) He claimed that he offered to pay for the room and told hotel employees that the room was solely for personal use. (*Id.*)

On February 15, 2017 (several days after receiving Franks' written statement), Poe issued a notice of potential discipline, which detailed the allegations against Franks and gave Franks a week to respond. (*Id.* at 40.) On February 22, 2017, Franks responded to the notice through a letter from his attorney. (*Id.* at 42.) In the letter, Franks denied the allegations and complained of racial discrimination for the first time. (*See id.*) He alleged that white employees received better treatment. (*Id.* at 43.) On March 1, 2017, Poe told Franks to "disregard" the notice of potential discipline.

---

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . .").

(*Id*. at 46.) Around this time, the city referred the matter to the Alabama Ethics Commission, which independently questioned Franks about the hotel incident. (Doc. 39-5 at 14.) On December 5, 2017, the Commission found probable cause that Franks violated the Alabama Ethics Act and referred the matter to the district attorney for the Fourteenth Judicial Circuit for review. (Doc. 39-2 at 47.) On December 12, Poe issued another notice of potential discipline, which informed Franks of the Commission's decision. (Doc. 39-2 at 48.) As before, Poe allowed Franks a week-long period to reply. (*Id*. at 49.) On December 20, Franks responded and again denied the allegations. (*Id*. at 50.) The following day, Poe dismissed Franks. (*Id*. at 52.)

On December 28, Franks appealed his decision to the Civil Service Board. (*Id*. at 54.) In April 2018, the Board held a two-day hearing. (*See id*. at 21.) In addition to Franks' account of events, the Board heard the testimony of two Holiday Inn employees. (Doc. 39-2 at 22.) The Board ultimately concluded "that Mr. Franks intentionally misrepresented the facts to the Holiday Inn Express employees regarding his presence . . . and intentionally misrepresented facts during the investigation to the Jasper Police Department." (*Id*. at 24.) Notwithstanding these findings, the Board decided that termination was "too severe a punishment under the facts in this case." (*Id*.) Instead, the Board deemed a fifteen-day suspension

(without pay) and a demotion to patrolman (for a minimum of one year) more appropriate measures.[2] (*Id.*)

As decreed by the Board, Franks resumed employment with the Jasper police department, but he claims that an atmosphere of suspicion prevailed. He alleges the city began improperly investigating his conduct. In one instance, Tucker looked into allegations involving a reputedly lascivious video of Franks and an unidentified female, which Franks denied. (Doc. 39-1 at 84.) After interviewing several officers whose narratives were inconsistent, Tucker did not punish Franks. (*Id.*) On another occasion, an off-duty officer from a different city reported Franks for drinking a beer with his gun visible while dining at a teppanyaki-style restaurant with his family. (Doc. 39-7 at 87.) Tucker investigated the report but found no wrongdoing. (Doc. 39-6 at 20.) Franks also emphasizes an acrimonious encounter with O'Mary. Franks originally alleged that O'Mary intentionally spat upon him amidst a heated argument. (Doc. 43 at 58.) In his deposition, Franks characterized it differently: "saliva was coming out of his mouth because he was yelling at me." (Doc. 39-1 at 56.)

When asked if any city employee ever said anything racially derogatory, Franks replied: "I don't recall anybody saying anything directly to me racially."

---

[2] Franks appealed the Board's decision to the Walker County Circuit Court, which affirmed the Board's decision in June 2021. (Doc. 39-2 at 38.)

Page 4 of 18

(Doc. 39-1 at 95.) Franks did mention, however, a meeting at which a supervisor referenced slavery. Several officers were in attendance, all of whom were white except Franks. (*Id.*) The supervisor made this comment: "So, let's do the best we can do while we're here those eight hours because . . . I don't want to get religious on you but that's what the Bible tells you. I believe it was Paul that was talking about even if you was a slave, you do the best job that you could . . .." (Doc. 39-8 at 48.)

On September, 26, 2019, Franks asked a superior if he could be absent from work the following day, but his superior replied no. (Doc. 39-1 at 41.) Franks was nonetheless absent the following day; however, he admits in his deposition that he worked another job and likely attended a homecoming parade that day. (*Id.*) When he returned, Franks supplied a doctor's note explaining his absence, but his superior thought it appeared fraudulent. (*Id.*) On October 18, Poe sent Franks another notice of potential discipline. (Doc. 39-2 at 19.) The notice alleged that Franks falsely claimed illness to avoid work. (*Id.*) As with prior notices, it gave Franks a right to respond and a right to appeal any adverse decision to the Civil Service Board. (*Id.* at 20.) Franks did not avail himself of these rights and instead resigned on November 4. (*Id.* at 18.)

## II.    Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the non-moving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory

allegations and "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir. 2013). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

### III.   Analysis

#### A. Discrimination[3]

Section 1981 forbids "intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). Plaintiffs can marshal direct or circumstantial evidence to show discrimination. *Jenkins v. Nell*, 26 F.4th

---

[3] *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("Standard alleges that he was terminated on the basis of his race and national origin (Caucasian-American), in violation of Title VII and 42 U.S.C. § 1981. Both of these statutes have the same requirements of proof and use the same analytical framework . . .").

1243, 1249 (11th Cir. 2022). To withstand summary judgment, a plaintiff can 1) meet the requirements of *McDonnell Douglas*, 2) "demonstrate a 'convincing mosaic' of circumstantial evidence that warrants an inference of intentional discrimination," or 3) "present direct evidence of discriminatory intent." *Lewis v. City of Union City*, 918 F.3d 1213, 1220 n.6 (11th Cir. 2019).[4]

"Under the *McDonnell Douglas* framework, the plaintiff bears the burden of establishing a prima facie case of race discrimination by demonstrating that: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) he was qualified to perform the job in question; and (4) his employer treated 'similarly situated' employees outside his class more favorably." *Jenkins*, 26 F.4th at 1249. For years, "similarly situated" has confounded federal courts, and various Circuits have devised different formulations of this essential phrase. *See Lewis*, 918 F.3d at 1224. In the Eleventh Circuit, "similarly situated" means "similarly situated in all material respects." *Id*. at 1226. Normally, a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff," "will have been subject to the same employment policy, guideline, or rule as the plaintiff," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as

---

[4] In a footnote to his brief, Franks refers to the "convincing mosaic" standard but does not argue how it allows him to survive summary judgment on these facts. Based on the court's understanding of the record, Franks cannot adduce sufficient circumstantial evidence to prevail on this alternative standard. Franks also does not present direct evidence of discriminatory intent.

the plaintiff," and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28. Nonetheless, these guideposts can only take us so far, and the necessary degree of similarity must be "worked out on a case-by-case basis, in the context of individual circumstances." *Id.* at 1227.

If the plaintiff can make a *prima facie* showing of discrimination, the burden then falls on the defendant to provide a legitimate, nondiscriminatory reason for its action. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant satisfies this burden, the plaintiff must "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination." *Lewis*, 918 F.3d at 1221. To establish pretext, a plaintiff must "show[] *both* that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).

In his brief opposing summary judgment, Franks proposes two comparators: officers Will Wickwire and Eric Hendrix. However, neither of these men are "similarly situated in all material respects." Franks argues that Wickwire gave inconsistent statements to his superiors during an investigation yet suffered no rebuke. However, Wickwire's alleged misconduct is not sufficiently similar to that of Franks. Wickwire's superiors wanted to know if he had seen a lascivious video involving Franks. (Doc. 39-7 at 101.) Apparently, Wickwire first denied having seen

Franks in the video but later claimed that Franks was in the video. (*Id*. at 102.) One can readily discern material differences between the potential misconduct of Wickwire and Franks. Notably, Wickwire did not improperly use his position in pursuit of personal gain. Further, the contents of a video depicting legal, off-site events would naturally be less alarming to a supervisor than an officer's potentially improper use of his official capacity to obtain a free hotel room (as well as Franks' alleged deceptive behavior during the initial investigation of this incident).

    Although Hendrix is closer to the mark, he is not a proper comparator either. In an arrest report, Hendrix allegedly wrote that a police vehicle had been inspected prior to a shift despite being told otherwise by the officer who had driven the vehicle. (Doc. 43-3 at 2.) He also charged a suspect with possession of drug paraphernalia in apparent violation of a superior's order. (*Id*.) For these transgressions, the department suspended Hendrix for ten days without pay. (Doc. 43-2 at 36.) But like Wickwire, Hendrix's deceit, though serious, did not result in an improper personal benefit. Nor does Franks suggest that Hendrix lied about his actions when the department investigated the matter. Given these considerations, Franks has not identified a proper comparator and cannot make a *prima facie* showing of discrimination.

Even if Franks could establish a *prima facie* case, the defendants have provided a legitimate, non-discriminatory reason for the termination of Franks. The allegations against Franks certainly merited the department's investigation. Moreover, after reviewing Franks' alleged misconduct, the Alabama Ethics Commission found probable cause that Franks violated the Alabama Ethics Act and referred the case to a district attorney for review. This independent assessment provided legitimate, non-discriminatory grounds to terminate Franks.[5]

**B. Retaliation**

Section 1981 also provides an avenue for retaliation claims. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 446 (2008). "To make a *prima facie* case for a claim of retaliation . . ., a plaintiff must first show (1) that she engaged in statutorily protected activity, (2) that she suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (quotations omitted). "If the plaintiff can establish that, the burden shifts to the employer to articulate a legitimate, non-

---

[5] Also, Franks has not shown that the city's proffered reason is pretextual. Granted, as Franks highlights, the Civil Service Board deemed termination too harsh and imposed lesser (though still severe) penalties, but the Board's decision only shows a difference in judgment as to the proper degree of punishment. The Board expressly concluded that Franks had engaged in the wrongdoing of which the city accused him. Franks also claims that the ten-month gap between the city's initial investigation and his termination is evidence of pretext. This argument suggests that the city would have fired Franks earlier if the city's true reason was not discriminatory. However, if the city's true motives were malign, it would have been illogical for the city to refer the matter to a neutral third-party like the Alabama Ethics Commission, so the court cannot see how the ten-month gap indicates pretext.

discriminatory reason or reasons for the retaliation." *Patterson v. Ga. Pacific*, 38 F.4th 1336, 1345 (11th Cir. 2022). "After the defendant makes this showing, the plaintiff has a full and fair opportunity to demonstrate that the defendant's proffered reason was merely a pretext to mask discriminatory actions." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009).

For the causation element, the protected activity must be "a but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). "Stated another way, a plaintiff must prove that had she not complained, she would not have been fired." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018).

In this case, Franks cannot satisfy the causation prong of retaliation. Before Franks first complained of racial discrimination on February 22, 2017, the department had already commenced an investigation and had sent a notice of proposed discipline. Clearly then, the initial investigation could not have been retaliatory as Franks had not yet complained. Furthermore, the city did not terminate Franks until the decision of the Alabama Ethics Commission in December 2017. This ten-month interval attenuates an inference of retaliation. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) ("[M]ere temporal proximity, without more, must be very close.") (citation and internal quotation

marks omitted); *Jefferson*, 891 F.3d at 926 ("[W]e have explained that an employee's termination within days—or at the most within two weeks—of his protected activity can be circumstantial evidence of a causal connection between the two."). In sum, the city contemplated disciplinary action prior to Franks' first complaint, suspended judgment on the matter for ten months, and made a final decision when the Alabama Ethics Commission rendered its conclusion. This sequence of events bespeaks the absence of a causal relationship.

During the ten-month interval, Franks contends he was the target of various unfair investigations. Yet Franks himself concedes that such allegations merited attention, and he received no punishment. As a result, these "investigations" are not evidence of retaliation. Franks also argues that there is a "close temporal proximity" because he made a second complaint of race discrimination the day before his termination. Franks, however, fails to note that he was not terminated until the decision of the Alabama Ethics Commission, and that the city gave him a week to respond to the decision. His second complaint of discrimination was made during the response period, and he was only terminated after the close of the week-long response period. As before, this sequence of events does not indicate a causal relationship between protected activity and adverse action because he made his

second complaint in response to the second notice of proposed discipline and the decision of the Alabama Ethics Commission.[6]

**C. Hostile Work Environment**

For a successful claim of hostile work environment, discriminatory harassment "must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks omitted). One can infer the required degree of hostility by looking to several factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993).

Franks cannot prevail on his hostile work environment claim as he did not suffer racial harassment of a "sufficiently severe or pervasive" nature. Aside from subjective perception and speculation, Franks offers little proof of behavior that is even arguably discriminatory. Franks argues that the investigation into the hotel

---

[6] As with Franks' discrimination claim, defendants have provided a legitimate, non-retaliatory reason for their actions. The allegations surrounding the hotel room incident merited the attention of Franks' superiors, and the city's belief that Franks had engaged in wrongdoing gave legitimate grounds for dismissal. *See Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) ("Nor does the statute require the employer to have good cause for its decisions. The employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.").

room incident is evidence of discriminatory harassment because white officers accepted free food and drinks from local businesses without reprimand. The record does suggest that officers sometimes accepted such items but does not indicate that these gratuities were limited to white officers. Also, Franks provides no evidence that officers obtained the free items under color of duty or engaged in any deception, and a clear qualitative distinction exists between a free Coke Icee and a free hotel room.[7] In any event, the investigation into the hotel room incident is not evidence of a hostile work environment.

Franks again argues that he was subjected to frivolous and arbitrary investigations (apart from the hotel incident). As already noted, these other investigations did not result in punishment, and the city was justified in investigating such allegations. Franks also claims the city promoted a less experienced white officer, but at his deposition, he conceded that he was not eligible for a promotion at the time because of the Civil Service Board's decision.

In his brief, Franks emphasizes a meeting in which, he claims, a superior officer told him to "be like a 'good slave' who takes pleasure in his labor." (Doc. 43 at 55.) But in his deposition, Franks did not say he was called a slave. (*See* Doc. 39-1 at 95.) Rather, at a meeting with numerous officers, a superior referenced slavery in

---

[7] Granted, over the course of a year, small gifts add up and could potentially violate ethical rules, but Franks offers no proof of such violations.

the context of the Apostle Paul's New Testament epistles.[8] (Doc. 39-8 at 48.) As an audio recording of the meeting makes clear, the comment did not pertain to race and was an exhortation for all the officers to work diligently. (*See id.*) When asked if he remembered any racially pejorative language, Franks only identified this incident but also prefaced his account by saying: "I don't recall anybody saying anything directly to me racially." (Doc. 39-1 at 95.) Viewed in context, this reference to slavery was not racial, but even if it had been, a single instance would be insufficient to establish a hostile work environment.[9] *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008) ("Although offensive, such instances of racially derogatory language alone, extending over a period of more than two years, are too sporadic and isolated to establish that her employers' conduct was so objectively severe or pervasive as to alter the terms and conditions of her employment.").

**D. Constructive Discharge**

An employee's decision to resign is tantamount to an actual discharge when "working conditions become so intolerable that a reasonable person in the

---

[8] As noted by the defendants, the Apostle Paul refers to slavery in several different books of the New Testament, often calling himself and other believers slaves (or servants) of Christ and righteousness (depending on the English translation of the original texts in Koine Greek). *See* Romans 1:1 & 6:18; 1 Corinthians 9:19–23. He also encourages slaves in the Ancient Roman world to "be obedient to those who are your masters according to the flesh" and to "render service, as to the Lord, and not to people, knowing that whatever good thing each one does, he will receive this back from the Lord, whether slave or free." *See* Ephesians 6:5–8 (NASB).
[9] Similarly, Franks' heated meeting with Mayor O'Mary is insufficient to establish a hostile work environment as it was an isolated encounter.

employee's position would have felt compelled to resign." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004). "Establishing a constructive discharge claim is a more onerous task than establishing a hostile work environment claim." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009).

Because Franks' claim for hostile work environment cannot survive summary judgment, his claim for constructive discharge must also fail. The two claims are largely based on the same factual tapestry, so it is evident that Franks cannot complete the "more onerous task" of establishing constructive discharge. Franks voluntarily resigned after the final notice of proposed discipline, which accused him of falsely claiming illness to avoid work. In his deposition, Franks admits that he worked at his other place of employment on the day in question and likely attended a homecoming parade. No one disputes the city's interest in investigating Franks' alleged misconduct, and Franks was aware that he had an opportunity to respond, the right to a hearing, and the right to appeal to the Civil Service Board. Franks decided to forgo these rights and resigned rather than respond. As such, Franks cannot prevail on his constructive discharge claim.

### E. State Law Assault and Battery

In accordance with 28 U.S.C. § 1367(c)(3), a district court "may decline to exercise supplemental jurisdiction" if "the district court has dismissed all claims

over which it has original jurisdiction." This decision is "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009). In the interests of comity and fairness, this court therefore declines to consider the merits of Franks' state law claim for assault and battery. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1089 (11th Cir. 2004) ("We have encouraged district courts to dismiss any remaining state claims when, as here, the federal claims have been dismissed prior to trial.").

## IV.   Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is due to be granted as to all federal claims. The Court declines to exercise supplemental jurisdiction over the state law claim of assault and battery and remands this claim only to state court. The Court will enter an Order consistent with this Memorandum of Opinion.

**DONE** and **ORDERED** on September 7, 2022.

_____
L. Scott Coogler
United States District Judge
211211